IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:11CR3067 |
| | ) | |
| v. | ) | |
| | ) | |
| MARK A. SKODA, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

     Mark A. Skoda (Skoda) filed a timely motion under 28 U.S.C. § 2255. I have conducted an initial review of the motion[1]. It plainly appears from the motion, any attached exhibits, and the record of prior proceedings that he is not entitled to relief.

### *I. BACKGROUND*

     After a jury trial, Skoda was convicted of conspiring to manufacture 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841 and 846. The evidence was overwhelming against Skoda. I sentenced him to 292 months in prison. *United States v. Skoda*, 705 F.3d 834 (8th Cir. 2013) (affirming conviction and sentence and holding that: (1) the defendant had no legitimate expectation of privacy in property owned by

---

[1] Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order.

his father and in remote location; (2) officers had probable cause to search defendant's vehicle; and (3) evidence was sufficient to support conviction).

Initially, Skoda was represented by John Vanderslice, a very experienced and zealous Assistant Federal Public Defender. Vanderslice withdrew upon learning of a conflict. Stuart J. Dornan was then appointed under the Criminal Justice Act. Like Vanderslice, Dornan is one of the most experienced criminal defense lawyers in the State of Nebraska, and he too is zealous. Skoda's complaints deal with Dornan.

The primary, but not the only, issue raised by Skoda's section 2255 motion relates to a suppression motion. Magistrate Judge Zwart conducted an evidentiary hearing on Skoda's motion to suppress. I independently reviewed her findings of fact at the time, and I have again reviewed them in light of Skoda's section 2255 motion. Her findings of fact are correct in every material respect. Nothing Skoda has alleged or attached as exhibits to his motion materially rebut or contradict the judge's factual findings. The judge found the following:

> Deputy Sheriff Guthard is a patrol officer for the Lancaster County Sheriff's Department. He has both training and experience in recognizing the components of a methamphetamine laboratory, and has a basic knowledge of how those components are used to manufacture methamphetamine.
>
> During the early morning hours of February 22, 2011, Deputy Sheriff Guthard was performing his patrol duties east of Lincoln, Nebraska. O Street is an east/west road. In the area of 139th and O Street, there is a northbound driveway or access road off of O Street which leads to a commercial use area and one residence; the commercial area to the west of the access road/driveway and the residence straight ahead and in the northeastern corner of the developed area at the site.
>
> The developed area includes strip mall (which includes a bar) fronting O Street, a storage unit facility behind the strip mall, and the residential

area (which has a circular drive and includes a house, a metal Morton Building, and a lean-to pole shed).

Until about the first week of February, 2011, Deputy Sheriff Guthard's typical rounds through the 139th and O site included driving past the bar area, then circling through the roadways of the storage unit area. Upon completing his strip mall and storage unit rounds, he would return to the access road/driveway, turn right, and return to O Street.

During his rounds through the storage unit area in late January, 2011, Deputy Sheriff Guthard saw a red van parked in front of storage unit four at about 2:00 a.m. The officer noticed an extension cord was being used to run electric power from outside the storage unit building to storage unit four. It was a very cold night. The officer knocked on the door of storage unit four, and Steven Bargen responded by opening the door. The storage unit was full of equipment, and the power cord was plugged into an electric heater which was heating a small living area within the unit. The officer asked if he could check serial numbers on some of the equipment within the unit. Bargen became hostile and told the officer to leave. The officer left.

Between Deputy Sheriff Guthard's late January encounter and February 22, 2011, other officers conducting rounds through the storage unit area also observed the red van in front of storage unit four. One officer noticed the van was equipped with a camera that would permit Bargen to see who was approaching the storage unit. Bargen was unwilling to open the storage unit door or speak with the officers when contacted by law enforcement during the first three weeks of February.

About a week and a half before February 22, 2011, Deputy Sheriff Guthard noticed several trucks pulled up to the back of the house at the 139th and O site, and he saw people loading furniture and household goods into the trucks. During his rounds following these events, the officer noted the house appeared completely dark, and there were no longer vehicles parked in front of the home. Based on these observations, the officer concluded the residents of the property had moved and the home was now vacant. He therefore extended his normal rounds through the 139th and O site to include driving north on the

-3-

access road/driveway, around the circle drive in front of the residence, and then exiting the area by returning to O Street.

At approximately 1:45 a.m. on February 22, 2011, Deputy Sheriff Guthard drove his cruiser throughout strip mall/storage unit area of the 139th and O site, and upon returning to the access road/driveway, turned left to check the vacant residential area. While circling through, he saw a red van at the bottom of a hill and adjacent to the pole shed. He drove toward the vehicle to investigate and called dispatch to report his activity.

As he drove toward vehicle, Deputy Sheriff Guthard recognized the vehicle. It was Steve Bargen's red van and it was running. The red van was parked directly behind a blue vehicle and adjacent to the pole shed located on the property.

The blue vehicle was not running. Deputy Sheriff Guthard requested backup law enforcement assistance.

Deputy Sheriff Guthard then exited his patrol vehicle and began walking toward Bargen's red van. Steve Bargen exited the red van, stretching and yawning as if he had just been awakened. Deputy Sheriff Guthard asked Bargen if anyone else was present. Bargen responded that his friend, "Mark" was out there. Mark was later identified as the defendant, Mark Skoda. Bargen explained he was at the property site because Mark Skoda's vehicle, the blue Trailblazer parked in front of Bargen's vehicle, had broken down. In response to questioning, Bargen stated he did not know where Mark Skoda was. Bargen explained that he did not exit his vehicle after he arrived at the site, but he did see Mark Skoda approach the blue Trailblazer, grab some things from a toolbox, and walk into the darkness.

Bargen was pat-searched and seated in the back of Deputy Sheriff Guthard's cruiser. The officer then approached the blue Trailblazer and walked around it with a flashlight to look for Mark Skoda. While doing so, he noticed a red gas can with a 3/4–inch diameter hose extending 3 to 4–feet from the opening. He also noticed a coffee grinder, some lithium battery boxes, what appeared to be lithium pulls or strips from

batteries, burn marks on the ground, pseudoephedrine packaging, aluminum foil containers, and rolled up pieces of aluminum foil. Based on these observations, and his training and experience, Deputy Sheriff Guthard suspected the items were being used to manufacture methamphetamine.

Deputy Sheriff Guthard contacted Sergeant Gaston. As instructed by Sergeant Gaston, Deputy Sheriff Guthard backed his cruiser onto a hillside vantage point to watch the area until backup officers arrived. A canine handler was contacted, and a dog was deployed at the scene to track Mark Skoda, who was apparently on foot. Sergeant Gaston contacted Deputy Sheriff Rhonda Wicht, who was stationed at 148th and O, the southeast perimeter of the property. Deputy Sheriff Wicht contacted the property owner, Ronald R. Skoda, Sr., and the location manager, Ronald R. Skoda, Jr., advised them of the circumstances, and requested permission to search the property. Ronald Skoda, Sr. and Ronald Skoda, Jr. both stated that no one should be at the residential area of the property, and both granted consent to search. Ronald R. Skoda, Sr. granted consent to search inside the house, and stated that Mark Skoda should not be living at the property.

Law enforcement officers searched the inside of the home[2]. They did not find Mark, but they did observe take out food containers, and a Coleman can (presumably a can of camp-stove fuel) with some receipts. Other than these items, the house was completely empty.

---

[2]More specifically, the testimony of one of the officers was that (1) they found an open sliding door to the home, they went in through that open door and searched the entire home; (2) they entered the home through that open door after hearing that the defendant's father and brother gave consent to search; (3) specifically, over the their radios, the officers who conducted the search heard that "we had permission from Ron Skoda [defendant's father and the owner of the premises] and Ron Jr. [defendant's brother and the manager of the family business that used the premises] that we could be on the property *and no one should be on the property*"; and (4) save for the trash, the Coleman can and receipts located adjacent to the open sliding door, *the home contained "no furniture." "The house was completely empty. It was -- it was bare."* (Filing no. 50 at CM/ECF pp. 50-54.) (Emphasis added.)

> Lancaster County Deputy Sheriff Jeremy Schwarz, a member of a team trained to dismantle clandestine methamphetamine laboratories, arrived at the scene at 4:15 a.m. Deputy Sheriff Schwarz used his flashlight to look in the windows of the blue vehicle. On the front driver's seat, he saw a pill that appeared to be a pseudoephedrine tablet. On the floorboard, he noticed a translucent white grocery bag, and with his flashlight, he could see pseudoephedrine boxes and receipts in the bag. Pseudoephedrine is a necessary precursor for the manufacture of methamphetamine. On the ground adjacent to the vehicle's exterior, Deputy Sheriff Schwarz saw pliers, the shell casing of a lithium battery, lithium strips or the peelings of lithium strips, and needle-nose pliers along with tin foil. Approximately 10 feet from the passenger door of the blue Trailblazer, he saw two gym bags and a red gas can with a three-foot white plastic tube. Deputy Sergeant Schwarz recognized the gas can configuration to be what is known in the methamphetamine world as the hydrogen chloride gas generator, which is used in the last step of manufacturing methamphetamine.
>
> Based on his observations, his training and experience, Deputy Sheriff Schwarz believed the officers had located a methamphetamine laboratory. Based on finding what appeared to be a pseudoephedrine tablet and pseudoephedrine packaging in the vehicle, and the components of a methamphetamine laboratory on the ground near the vehicle, Deputy Sheriff Schwarz believed a search of the red and blue vehicles would reveal evidence of ongoing criminal conduct.
>
> The red van was searched first. The officers found a one-gallon jug of Transchem Muriatic Acid, a chemical used with the aluminum foil to create hydrogen chloride gas inside gas cans. They also found a coffee grinder, which is used to grind the pseudoephedrine tablets for use in manufacturing methamphetamine.
>
> The blue Trailblazer, which is registered to defendant Mark Skoda, was searched without a warrant and without the defendant's consent.

*United States v. Skoda*, 2011 WL 6055427 (D. Neb.), adopted *at United States v. Skoda*, 2011 WL 6055401 (D. Neb. 2011).

The conspiracy in this case spanned a period of more than two years from 2009 to 2011. The jury found that Skoda was responsible for 500 grams or more of methamphetamine. At sentencing, I sustained, in part, Dornan's objection to drug quantity and found that "the proper base offense level is 34 based upon 915 grams of pseudoephedrine" rather than the kilo-plus quantity the government was asserting. (Filing no. 114 at CM/ECF p. 6.) Furthermore, I sustained Dornan's objection to a 6-level enhancement for putting a child at risk. (Filing no. 114 at CM/ECF p. 10.) I also sustained Dornan's objection in part to Skoda's role in the offense, and I determined that a 2-level enhancement was warranted rather than a 4-level enhancement. (Filing no. 114 at CM/ECF pp. 14-15.)

Ultimately, I found that Skoda's total offense level was 38 and his criminal history category was II establishing a Guideline imprisonment range of 262 to 327 months in prison. (Filing no. 106.) Skoda was also subject to 21 U.S.C. § 851 and 28 U.S.C. § 841(b) because of a prior felony drug conviction.[3]

Despite his relatively low criminal history score of II, Skoda dealt in methamphetamine much of his adult life. (Filing no. 99 (Presentence Report).) He had previously been convicted in this court of a methamphetamine conspiracy. He was sentenced to 108 months in prison, but that sentence was reduced to 44 months, pursuant to Rule 35(b), for Skoda's cooperation. Despite this reduction, Skoda began to use drugs again.

On February 3, 2006, he was sentenced to 36 months in prison for violating supervised release. While incarcerated at the Federal Corrections Institution in

---

[3]As a practical matter, proof of the (undisputed) prior drug conviction meant that Skoda faced a statutory minimum sentence of 10 years if the government was able to prove that the conspiracy involved 50 grams or more of a mixture or substance containing methamphetamine rather than 500 grams of that substance as set forth in the superseding indictment. The Guideline range, however, would be higher, obviously, if the jury found that 500 grams or more were involved.

Waseca, Minnesota, the defendant completed the 500 hour Residential Drug and Alcohol Program. That treatment did not take, and Skoda quickly went back to his old ways as this crime, which began in 2009, sadly demonstrates.

## *II. ANALYSIS*

For four reasons, Skoda claims that Dornan was ineffective. Skoda's arguments are without merit, and, frankly, border on the frivolous. Next, I briefly explain why that is so.

The *Strickland* standard must be applied to Skoda's claims. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984) (announcing principles for evaluation of claims of ineffective assistance of counsel under the Sixth Amendment). In order to prevail on a claim that defense counsel rendered ineffective assistance of counsel under *Strickland*, the claimant must establish two things. He or she must establish (1) that "'counsel's representation fell below an objective standard of reasonableness,'"[4] and (2) that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[5] *Nguyen v. United States*, 114 F.3d 699, 703-04 (8th Cir. 1997) (quoting *Strickland*, 466 U.S. at 688, 694).

---

[4] A judge's "scrutiny of counsel's performance must be highly deferential" and the judge must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Reed v. United States*, 106 F.3d 231, 236 (8th Cir. 1997). In other words, a judge should make "every effort" to "eliminate the distorting effects of hindsight" by examining the lawyer's performance from "counsel's perspective at the time" of the alleged error. *Strickland*, 466 U.S. at 689.

[5] A "reasonable probability" is less than "more likely than not," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), but it is more than a possibility. *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005). It must be compelling enough to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

An evidentiary hearing is unnecessary if the claimant makes an insufficient preliminary showing on either or both prongs or the record clearly contradicts the claimant's showing on either or both prongs. *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995) (affirming denial of § 2255 motion without a hearing in the face of an ineffective-assistance-of-counsel claim; stating that no evidentiary hearing is required where "(1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact").

### *Claim One*

Skoda asserts that Dornan was ineffective for failing to call Skoda's sister, Brenda Lipsey, to testify at the suppression hearing to prove his standing to contest the search. Skoda attached her affidavit to his motion. (Filing no. 124 at CM/ECF pp. 37-38). Lipsey states that she knew Skoda was living at the residence that was searched because she handled the bills for her father and that Skoda had paid for the month of February of 2011. She adds that while Skoda had moved most of his belongings out of the home, "[h]e had a desk and chair in one room and was sleeping on the floor." She asserts that her father was mistaken when he gave consent to search since he wrongly believed that his son, the defendant, had moved out. She acknowledges that Dornan interviewed her, but that he failed to ask her if the rent was paid through February. She states that she would have appeared and testified at the suppression hearing if she had been presented with a subpoena.

From the foregoing, Skoda asserts that had Dornan called his sister to testify, her testimony would have proven that he had standing. Therefore, he claims that Dornan was ineffective. Skoda's argument fails. Dornan's representation did not fall below the first prong of the *Strickland* standard because he failed to call Lipsey to testify.

Initially, it is apparent that Lipsey was mistaken. She had no personal knowledge whether Skoda was *actually* residing in the home. She represents that there was furniture in the residence belonging to Skoda. Yet when the law enforcement officers searched the entire residence the door was ajar, there was no furniture in the residence, and the place was bare.

Moreover, even if she was correct and her father was mistaken because Skoda was in fact renting the residence and residing therein, that mistake of fact cannot be attributed to law enforcement. They reasonably relied upon the elder Skoda's consent. *See*, *e.g.*, United States v. Almeida-Perez, 549 F.3d 1162, 1169-1170 (8th Cir. 2008) ("Even if the police make a mistake of fact about the third party's authority over the premises, the search will be legal if the circumstances lead the police reasonably to believe that they have the consent of a third party with common authority." *See also* Illinois v. Rodriguez, 497 U.S. 177, 184-86 (1990) ("The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.").[6]

### *Claim Two*

In a convoluted argument, Skoda argues that Dornan was ineffective for failing to "litigate" at trial or on appeal the "bogus pill logs." Essentially, his argument boils down to this assertion: A pack of 96 pills containing 60 milligrams per pill exceeded

---

[6]As to the outbuildings and surrounding grounds, it is undisputed that the elder Skoda and Skoda's brother had at least joint and common authority over the premises as their testimony at trial clearly established. They used the acreage for their business.

-10-

the 3.6 gram daily purchase limitation set by federal law and any pill logs to the contrary must be "bogus."[7]

The jury was told at least twice by pharmacists from the pharmacies where the pills were purchased that the 3.6 gram daily limitation was in existence and strictly enforced through computer systems and otherwise. (Filing no. 88 at CM/ECF pp. 160 (Kyle Baker), 171 (Brian A. Bruggeman).) Moreover, the government specifically told the jury during closing argument that a "96-count box of pseudoephedrine has 2.88 grams of pseudoephedrine in it." (Filing no. 88 at CM/ECF p. 555.)[8]

Separately, the government did not rely solely on pharmacy logs to determine the amount of methamphetamine that was produced. It also relied upon the testimony of the participants. For example, and realizing that this conspiracy spanned at least two years, Mary Vidaurri, Skoda's girlfriend for a time, testified that during one ten-month period when she was physically present at the acreage, it was probable that 500 grams of methamphetamine was produced. (Filing no. 88 at CM/ECF pp. 258-259.) Indeed, she said the cooking went on three days out of every week and at least one "cook" produced 13 grams of the drug. (*Id.* at CM/ECF p. 259.)

---

[7]It is true that under federal law: "Individuals may not purchase more than 3.6 g of pseudoephedrine in one day . . . ." Laura Carpenter, Rph, JD, Pseudoephedrine sale and reporting laws, *Pharmacy Law CE Column* (October 4, 2009).

[8]"This type of medication normally contains 30 milligrams of pseudoephedrine per tablet so two 48 tablet boxes (or one 96 tablet box) will result in a total of 2.88 grams purchased." Kansas Methamphetamine Prevention Project, (last accessed December 4, 2014).

In short, the jury was not misled by the government even assuming the transaction logs contained errors. And Dornan did not breach the *Strickland* standard of care by failing to put forth Skoda's confusing argument.[9]

### *Claim Three*

In the third claim, Skoda complains that Dornan was ineffective because he did not tell Skoda that if he pursued the motion to suppress, the government would supersede the indictment and also file a § 851 information. However, there is *no evidence* whatever that (1) the government sought a superseding indictment or filed the information for an unlawful purpose, or (2) the government told Dornan that it would seek a superseding indictment or file the information if Skoda went forward with his suppression motion. In fact, the superseding indictment was filed three weeks *before* the suppression hearing. (Compare filing no. 41 with filing no. 44 (text minute entry, hyperlink not available).[10]) In short, Skoda's speculative conclusion is lacking in foundation, there is nothing to support it, and the claim is accordingly rejected.

---

[9] To the extent that Skoda claims that the presentence report contained errors from the "bogus" logs, those errors are meaningless. I sustained Dornan's quantity objection and arrived at my own calculation of 915 grams of pseudoephedrine (9,150 kilos of marijuana). Furthermore, even if my determination was in error, the magnitude of the error would have had to have been huge to change the base offense level or, for that matter, impact a calculation relative to the statutory minimum threshold either under the superseding indictment or the § 851 information.

[10] As is the practice in this District, the § 851 information was filed on December 8, 2011 (filing no. 59), shortly before trial on December 12, 2011. That gave Skoda the maximum time possible to negotiate with the government about a plea without having to deal with the enhancement brought about by a § 851 information. *See* 21 U.S.C. § 841(b).

*Claim Four*

Skoda claims that he is entitled to relief because of Dornan's "cumulative" errors. Since there were no such errors, "cumulative" or otherwise, Skoda is not entitled to relief. Skoda additionally asserts in this claim that Dornan should have called an expert witness to testify about the "yield" of his methamphetamine-making operation. There are several reasons why this argument fails.

Initially, if Dornan had called an expert to talk about "yield", this would have amounted to an implicit concession that Skoda ran a significant methamphetamine manufacturing operation. Additionally, if Dornan would have called an expert to talk about yield, this would have allowed the government to put various hypothetical questions to the expert, the answers to which could have been very harmful to Skoda. For example, the expert would have had difficulty dealing with Mary Vidaurri's testimony that during one ten-month period when she was physically present at the acreage, it was probable that 500 grams of methamphetamine was produced and that one cook resulted in an astonishing 13 grams[11]. Still further, had Dornan called an expert, he risked harming Skoda at sentencing if the expert made yield and quantity concessions to the government. That is particularly true given the fact that the government called no expert and I sustained in part Dornan's quantity objection at sentencing. Next, it is possible that had Dornan called an expert that Skoda's past criminal record, including his experience as a methamphetamine cook, could have been presented to the jury to show that Skoda had the experience to produce large

---

[11]For example, Robert Kreft, a senior forensic chemist for the DEA, with 36 years of experience, testified in one recent case that "the maximum theoretical yield for methamphetamine manufactured from pseudoephedrine was 92 percent, but that an individual manufacturing methamphetamine in a clandestine laboratory would likely have a yield of from 20 to 80 percent, depending on the individual's skill and other factors. Kreft explained that an experienced methamphetamine cook will have a higher yield as a result of having refined his or her technique." *United States v. Wells*, 706 F.3d 908, 912-913 (8th Cir. 2013).

quantities.[12]  Finally, given the foregoing, the decision of Dornan not to call an expert to testify about "yield" was well within the standard of care required by prong one of *Strickland*.

IT IS ORDERED that:

1. The Motion to Vacate under 28 U.S.C. § 2255 (filing no. 124) is denied and dismissed with prejudice.

2. No certificate of appealability will be issued.

3. A separate judgment will be issued.

DATED this 5th day of December, 2014.

BY THE COURT:
*Richard G. Kopf*
Senior United States District Judge

---

[12]*Id.* at 911-912, 915  ("The jury heard testimony that Wells had pleaded guilty in 2001 to attempting to manufacture methamphetamine after police pulled his car over and discovered numerous items used in the manufacture of methamphetamine, including pseudoephedrine. . . . . Given Wells's experience as a methamphetamine cook, as evidenced by the length of the conspiracy *and his prior conviction for attempting to manufacture methamphetamine*, a reasonable jury could find that he was capable of attaining a greater than 20 percent yield." (Emphasis added.)

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.